Good morning and we appreciate very much your being here and welcome to the University of Virginia sitting of the Fourth Circuit. It's a very special occasion for us because each one of the we'll be rotating panels throughout the session are all graduates of the University of Virginia and so we really have been thinking about for some time about all returning together to our alma mater and I just want to say what a pleasure it is to be here and I want to thank you all for taking the interest in being here. We are going to hear three cases and then after our third case if someone's interested, if people are interested, we'll hear questions from the audience about the operation of the Fourth Circuit and how we go about our business. I want to also say what a wonderfully hospitable Dean Paul Mahoney has been in connection with this visit. He's a longtime friend of mine and I think the every time I speak to students or faculty or alumni they all seem united in their appreciation for the job that he's done for the law school. We're gonna miss him very much but I know he's going to be a contributing member of the law school community for many years to come. One final thought and then we'll get right into our cases. I think each of us would say we have very fondest memories along with some terrifying ones of our time at the University of Virginia. A lot was different when we went there but a lot of it's the same and we extend to you the hope that you'll love your time here at the law school as much as we loved ours and we're so happy to have you here and we'll begin with our first case. We will take a brief recess between cases and reconstitute our panel. Mr. Vaughan, whenever you're Good morning to the members of the court. Robert Vaughn on behalf of the appellant in this matter and the trust of the plaintiff below Sorostrian Center and Darby Moore of Metropolitan Washington DC. I'll use the first letter CCDMW to shorten that name a little bit although I may tend to mess that up as well. It is my pleasure as well to be here. I'm a bit in enemy territory I think as we married grad but I'll do my best to hold sway. I'm also apologize to the law school personnel behind me. This may not be the best example of moral argument but again I'll do my best to address the issues in this particular case. The court has the briefs in the matter and so certainly it's familiar with the basic facts and I don't want to belabor that except with a few comments. Both CCDMW and Rustem Giyev Foundation, which I'll refer to probably as RGF, are charitable religious entities whose primary purpose is to foster an ancient Persian religion known as Zoroastrianism. I can't speak English much less these words but Zoroastrianism. It is a Christianity with a number of the same beliefs that began in the 700s. This particular dispute involves the use of a piece of property that is titled in the name of RGF that's located in Vienna, Virginia which is part of. You have a threshold jurisdictional issue. Yes sir I do. That you wanted to bring to the court's attention. You want this case remanded to state court? I do. We believe Is that just because you lost the law? Were you happy enough to litigate it? I'll litigate it wherever I may happen to be but I believe in this particular instance without question the case belongs in the state court because it involves. Tell us why you think the district court was wrong. The main issue is what is the citizenship of the trust and the beneficiaries in this particular instance. The district court adopted the opinion in Emerald Investors and which was also followed by the Western District's decision in Poulos versus Geo Metro that the citizenship of the trust is to be determined by looking at both the citizenship of the trustees and the citizenship of the beneficiaries. I should say the domicile to be more specific. What is it that you think should be the jurisdictional test? ZCDMW agrees with that jurisdictional test. We don't have an issue with that. Citizenship of the trustees and beneficiaries? That is correct. Well didn't the district court conduct jurisdictional discovery on that point? If the term discovery is meant to address did we go through the discovery process and address that the answer to that is no. There were submissions in conjunction with the original motion to remove and the response filed by ZCDMW but the court ignored much of the facts or should say much of that information in reaching its conclusion and considered even contrary to its own ruling evidence or I should say information. Which ones of the which ones of the trustees or beneficiaries were citizens of Virginia in your view? Well the evidence didn't establish that one way or the other and the problem with it is because the court did not consider all of the individuals who were the trust trustees of the trust or even make the threshold determination. Which trustee do we find in the record that you contend was not their citizenship was not proved? The five that were listed in the trust, well none for that matter, but the specifically the court didn't address at all the five that were named in the trust agreement. Never addressed that one way or the other nor did RGF for that matter. Opposing counsel put on evidence as to who were the trustees as of the time of the suit and where those trustees live. So there was evidence in the record as to all that. So wasn't it your burden at that point to put on some evidence to discredit that evidence of citizenship? And we did in two ways. At first you missed the threshold with all due respect is the RGF itself is the one who submitted the actual trust agreement which listed six individuals only one of which were covered in the submissions by RGF and again there was no evidence to establish the citizenship or domicile of any of those five individuals. I thought their evidence was that here are the current trustees who have succeeded to the original positions of being a trustee during the term of this trust and that was their evidence. These are the trustees at the time of this suit. That wasn't evidence that was argument. In fact if you go back to the district court's opinion letter it refers to document number 12 which is the memorandum that RGF provided and refers to page 3 which is their argument. The district court never looked at any submissions beyond the argument as to making a finding. I thought they submitted affidavits from the trustees and copies of driver's licenses and that sort of thing. They submitted one affidavit and that was the affidavit of Dr. Jehanian. There were no affidavits of any other trustees and as I emphasized then as I emphasize now the trust agreement itself sets forth the parameters by which the trustees are to be determined. They serve for life unless they're removed, resign, die or are incapacitated and there was no evidence put before the court much less argument that any of the five other than Mr. Sarfay who was the sixth one named in the trust you know one of the purposes of one of the things you look for in a jurisdictional test is some degree of ascertainability and you don't want the resources of the litigants just chewed up forever in jurisdictional discovery. This case has been litigated on the merits and I'm wondering how efficiently use of not only the court's resources but also the litigants resources it is to remand on an issue of the citizenship of one or another trustee. I mean that just keeps the meter running and consumes the litigants resources and we may be getting nowhere near the merits and that doesn't seem to me unless there's some core jurisdictional issue involved that this is a very efficient way to go about things. Are we just churning? Well, I don't think to use an old phrase two wrongs make a right and in this instance the failure of the district court to assess who the trustees were and then determining their citizenship versus residency are two mistakes and the fact that it went forward in that light I don't think should be used as a base to say oh well no harm no foul to borrow another phrase. Are you abandoning your argument now that you had asserted that some of the beneficiaries of the trust were Virginia citizens and I haven't heard you say that today. We have not. I'm sorry I didn't mean to interrupt. No, that's okay. Are you abandoning that argument? Absolutely not. I'm not abandoning it.  Well, let me address one issue if I might before that and then I'll go right specifically into that one and to address Judge Wilkinson's comment. One of the things the district court did with regard to beneficiaries that we contend is fatal is that it prejudged this case. In the opinion written by the judge in the page 165 of the appendix the district court made a specific finding that ZCDMW was not a beneficiary of the trust because the lease was already terminated and mind you the whole case was to determine whether or not the lease had been terminated. So you're saying anybody who has a lease is a beneficiary of the trust simply because they've executed a lease entitling them to some use of the property? No, what I'm saying is the threshold question or I should say the question in this case was whether or not the lease was in existence. We filed a declaratory judgment, ZCDMW filed a declaratory judgment that stated the lease was in fact in full force and effect. That was the issue before the district court. That was the ultimate decision to be decided. Just assume that the lease is in effect. How does that help you prove a beneficiary status? By the district court's own statement. If the lease is in effect, ZCDMW is a beneficiary of the trust. That was the district court's own statement. And that's based on what? ZCDMW is a non-stock entity. It's effectively a foundation that's formed for the promotion of that religion. And ZCDMW and various members of that, which all if not, I should say the vast majority if not all, are Virginia residents. Were actively using the property through at least June of 2014 when the final decision of the district court came down. Well, they used it under a lease. How does that make them the beneficiary of the trust? ZCDMW itself was the party to the lease. The members of the society, if you will, of the foundation are the ones who were using the premises for their religious purposes. Is it clear that we should determine the citizenship of a trust for diversity purposes through looking at the citizenship of each of the beneficiaries or each of the trustees? In the Hines case, the Supreme Court adopted a nerve center test for the citizenship of a corporation. Is there any merit in your view to adopting a nerve center test for the citizenship of a trust and having the citizenship of a trust be more or less similar to the citizenship of a corporation? And I suppose the nerve center of a trust would be the place where it's administered in terms of the accounting of the assets, in terms of the investment decisions that the trustees are making for the trust, in terms of the disbursements to beneficiaries. If you took the nerve center test, that would make the trust a citizen of Kansas City, Missouri. So you'd have diversity in that sense. But I'm wondering, there's been a lot of debate about this, but is it clear that the proper jurisdictional test for the citizenship of a trust should be the citizenship of every trustee and every beneficiary? Because we may run into the problem that we're running into here, and that is we can just litigate domicile and residency ad infinitum as a preliminary matter. So I'm just wondering if the jurisdictional test is sound. I believe the jurisdictional test used by the district court is sound, and it's not opposed, as I read the briefs from RGF. And I don't think the test that the court is articulating is the appropriate test when it comes to a trust, in part because the purpose of the trust, specifically, this was a charitable trust to administer property for the benefit of parties and individuals who are promoting the religion. I would argue, as I did in my brief, that one of the things the court should look for is, really, where is the situs of the assets of the trust? That is where, to use your phrase in a different fashion, the nerve center of the trust is. In this case, the seminal asset of the trust, as far as all the documentation could demonstrate, the seminal asset of the trust was this piece of property in Fairfax County. That's where everything that existed, so to speak, with regard to the trust was going on. So, if we're going to look at sort of a nerve center test, then we ought to be looking at where are the activities of the trust actually taking place? One thing to worry about is that we have a scattering of jurisdictional tests across the country. Maybe one court adopts a nerve center test, and another adopts an assets test, and another adopts a trustees and beneficiary test. And so, you have the law of diversity of citizenship in some disarray, and we've got this third circuit test, this third circuit case out there, which adopts a trustees and beneficiaries analysis. And isn't there some value to avoiding inter-circuit conflicts on a matter of this nature and simply going ahead, as the district court did, with a trustees and beneficiaries analysis? I think the best way to address that is for the fourth circuit to say, yes, that the test adopted and utilized by the district court in this case, in the Western District, in the Poulos case, was, in fact, the appropriate standard to use. And at that point, we have two specific circuits who adopt that standard. I'm not aware of any other circuit, per se, but I'll be frank and say I haven't done that research in that regard. But it didn't come up when I did the research initially, or when RGF did, or certainly when the court did, of any other standard to be used. All right. Thank you, sir. Yes. If I could address, just use a minute of my rebuttal time to address Judge Keenan's question that I haven't actually addressed yet in terms of the beneficiaries. One of the beneficiaries, without a doubt, are the citizens of the County of Fairfax. As I stressed in my papers in 2004, as part of this process that resulted in the circuit court order of January of 2004, RGF entered into a deed of dedication and easement with the County of Fairfax. So you're saying every time there's an easement that's been dedicated, that the one million citizens of the county, in which case I believe Fairfax exceeds a million, that there are now a million beneficiaries added for purposes of analysis? In this particular case, the trust simply says that the beneficiaries of it are those individuals who are promoting the Zoroastrian religion. As the district court itself said, RGF is very general in the way it treats that aspect of the trust. Well, Fairfax County certainly isn't promoting the religion. In this particular instance, in order to build the Darby Mar, the County of Fairfax had to grant certain easements to RGF on the property. Right, but those are just land use requirements that they have that apply to everybody, irrespective of who's promoting what. If you're a property owner, you have to comply with certain regulations in order to... In general, that's true, but not in this particular case. The vast majority of land use situations don't require ingress and egress easements for use of the general... Why wouldn't we just look to the trust instrument itself for the designation of beneficiaries? I'm sorry? You seem to want the Fairfax County residents to be beneficiaries, and you seem to want those who have contractual arrangements with the trust to be beneficiaries. It seems to me you want the whole world to be beneficiaries, and I'm just wondering why we don't look at the trust instrument itself and see what the trust instrument itself designates as beneficiaries. That's the normal definition of a beneficiary. At any rate, we've gone on. You can use some of this for rebuttal, but my coworker has a question. 30 seconds or less, different topic. Tell us very specifically why the fee order needs to go back. I'm sorry? Why the fee order needs to go back. Because in this case, the only two matters that RGF prevailed on were the removal and the summary judgment motion. All of the other matters, in fact there were three specific ones, ZCDMW prevailed on. In each of those instances, all RGF did was submit a bill for the totality of the case. They never made an effort to segregate it down into individualized matters in which they prevailed. And so ZCDMW effectively ended up paying RGF on matters that it did not prevail upon. Thank you. Thank you. Thank you. Mr. Ruling, we'd be happy to hear from you, sir. Thank you, your honor. May it please the court. My name is Bill Ruling. I'm also, like Mr. Vaughn, a William & Mary graduate, so I'll try and keep that tradition going. The Roostam-Gieve Trust comes before you today, as Mr. Vaughn said, as a charitable religious organization. The Zoroastrian religion was founded in the 7th century upon three principles, speak good words, do good deeds, and think good thoughts. And that is how the Roostam-Gieve Foundation has couched its approach to fostering the religion throughout its history. In this particular case, the court has obviously hit upon the issue of first impression in this jurisdiction, and that is the jurisdictional question. How do you determine where a trust resides? Do you agree with the application of the trustees and beneficiaries? I mean, I realize you don't agree with their view of the beneficiaries or the trustees, but is there some common ground on the fact that the test should be the trustees and beneficiary? Yes and no, your honor. And the reason I say that is because we did not challenge the Third Circuit's application of the Third Circuit test from Emerald Investors at the trial level, because we believe that on the facts of this case, we still fit within that test. The problem that comes in when you analyze how the Third Circuit got to that test and how PULO supplied that test is an important factual distinction that I think you hit on in argument with opposing counsel. And that is, it's fine if you can identify clearly beneficiaries, but the Third Circuit... Well, in the normal, I mean, this is an unusual case, it seems to me, because they're an inordinately large number of trustees and they're potentially, according to them, but in the usual case, you're going to have a trust document and you're going to have maybe the trustee being the bank and one or two other people and you're going to have the beneficiaries actually named in the trust instrument itself. So, I'm not sure that the difficulties of application here are really indicative of the difficulties of application in a normal case. And what I would suggest to you is, apart from avoiding a circuit conflict, the value of the trustees and beneficiaries test is that it takes account of the legal and equitable interests both in determining the citizenship of the trust. I mean, they're two different interests, but they're both, I would say, significant. And the trustees and beneficiaries test takes into account both. And doesn't it also have the advantage of not sending in a whole lot of state court and state law cases into federal court? I mean, you look at this case here, what we are doing is interpreting the terms of a lease, or at least that's what we should be doing. And there's no reason that's right at the core of what state courts do. And I just don't want a whole lot of cases involving the interpretation of wills and the trust instruments that those wills set up coming into the federal court under principles of state contract law and state trust and estate law. So why shouldn't we have a jurisdictional test that minimizes the possibilities of incomplete diversity? Because it seems to me that if you take up both the trustees and the beneficiaries, you not only capture the equitable and legal interests surrounding a trust, but you have a broad enough number of citizenship so that they're likely to be incomplete diversity, and the case is likely to remain in state court. And perhaps that's ideally where it should be, because the state courts have a particular competence in this kind of thing, probably more so than do we. So I don't see what's wrong with the trustees and beneficiaries tests. And Your Honor, please don't misunderstand me. I'm not saying that in the general case that is a problem. In fact, the Third Circuit does a very good job in the Emerald Investors case of analyzing potential tests that could be used. Well, why is it a problem in this case? Your Honor, as I said in the beginning, I didn't think it was necessarily a problem. We believe, Rustam Geve contends, that you get to the right answer applying the Emerald Investors test in this case. The distinction that comes in, or the difficulty that the court has to struggle with, is because you've got this expansive reading of the trust document that the ZCDMW would like this court to engage in, rather than, as Judge Wilkinson pointed out, looking at the trust document itself, which is exactly what Judge O'Grady did below. Well, the trust document specifically excludes private individuals from being beneficiaries, does it not? Yes, it does, Your Honor. Okay, why haven't we heard that from you then? Just haven't gotten there yet, Your Honor. Where I wanted to go was to the language of the trust document, because it sets up two things that you can look to in applying the Emerald Investors test here. It says, first of all, not just that the purpose of the trust is to advance the Zoroastrian religion, but in a very particular way. Exclusively for religious purposes, by grants to qualified groups or organizations engaged in the practice or advancement of the Zoroastrian religion, provided, however, that no part of this trust fund shall inure to the benefit of any private shareholder or individual, the language that Your Honor referred to. In this case, the second affidavit that was submitted by Dr. Jahanian specifically addressed that aspect of it, because Judge O'Grady in his interim order said, it appears that there are no beneficiaries, although one may become a beneficiary if they receive grants. And so Dr. Jahanian's second affidavit specifically addressed the fact that they have given grants in the past, that the most closely associated grant to this area was one made in Maryland, in Boyd's, Maryland, to the Comron Foundation of $100,000. And it said expressly that the distinction between the grants that have been made under the trust in the past and the contractual relationship with ZCDMW was exactly that aspect of it. That one is contractual in nature. In this case, as I understand the record, you can tell me if you disagree, there are only two potential beneficiaries that have been identified. One is Fairfax County, and the other is your opposing counsel's client. Those are the only two potential beneficiaries that you would judge against the language in the trust. No, Your Honor. So you got more? I think the one beneficiary that's identified in the record is the one that received a grant, and that was the Comron Foundation. RGF never intends to... There's no allegation that they're a Virginia citizen. There is not, Your Honor. We're only concerned with Virginia citizens, and there are only two of those that are possible based on this record. There are only two that have been asserted, Your Honor. I would disagree with the characterization that they're possible, and that gets to the heart of it. Well, you have to compare them against the language of the trust to see whether or not they would qualify. And addressing, first of all, the Fairfax. Fairfax, the only reason that the County of Fairfax and its citizens are even raised here is because of this deed of dedication. They're licensees. They are not beneficiaries of the trust. As the court has already indicated, they don't, in fact, one would probably say they're constitutionally prohibited from advancing the Zoroastrian religion because of separation of church and state. But even if that were not an apparent barrier there, there's no indication that they received any actual grant from the trust, that they had any relationship with the trust other than the fact that the trust said, if you need to access it for emergency services, if you need a utilities easement, we'll do that. But that's routine in the process of development of property, and that's exactly what the heart of this lease was about, as Judge O'Grady recognized. The principal purpose behind it was to enable the building of the Darbin Merit, the religious center, the temple, and the residence for a mobet, or a priest. What about this memorandum of understanding that the opposing counsel brings up? And they've indicated, well, through various oral representations in the memorandum of that the full construction of a place of worship really didn't need to take place under the deadline set forth in the lease. They say you gave them signals that you were constructing a place of worship in Maryland, and that maybe renovation would do, and this was embodied in a memorandum of understanding. Did you, in your judgment, did you send forth those signals that gave them reason to believe that they didn't need to construct a place of worship by the deadline set forth in the lease? First, Your Honor, I would take issue with your characterization of even the allegation in the record that my client had indicated renovation was sufficient, because that is not present in the record anywhere, nor do I believe that allegation is there. Before this court, the ZCDMW has alleged for the first time that they complied with the lease because they renovated the property. But if you look at the lease amendment language itself, it belies that concept. And in fact, if you look then to the written discovery that was done in the case, specifically requests for admissions, which appear in the record at page 941, in number 18, we asked expressly, did you construct the Darbay Mare? They admitted they had not. We asked in question 21, did you do it by 2013? They admitted they had not. They're bound by those admissions. The lease was never amended during the discussion over the memorandum of understanding and everything? The lease document was never altered? No, it was not, Your Honor, because the memorandum of understanding is really a red herring in this case. What are you saying? It's an agreement to possibly agree or an agreement to talk about agreeing? I think if Your Honor reads the language of the memorandum of understanding, it expressly says it is. Because it states that in, I believe it's number two in the memorandum of understanding, it states that ZCDMW is to propose a construction timeline with milestones to be agreed upon by the parties, that they're to provide a backup contingency plan to be agreed upon by the parties. Even if you say that it was a contract to amend the lease, which I think is a huge leap here, because the court would have to be able to supply what is the new term of the lease, what is the rent of the lease, what are the obligations under the lease, all of that doesn't appear in the memorandum of understanding. But even if you assume that it was a modification of the lease itself, they breached every condition in the memorandum of understanding that the court found. So you're saying the essence of the contract was that they got a sweetheart deal in the dollar a year in terms of rent, and that the consideration for that was that they were going to actually construct a place of worship. I think that both the lease language expressly sets that up, and the course of conduct between the parties also supported that. I mean, if you look at the testimony that was submitted by ZCDMW in support of summary record, what they argued throughout there is that they were spending hundreds of thousands of dollars to rezone to try and get construction plans done. They were preparing for construction of an $8 million facility. That wasn't being done just out of the goodness of their heart. There was a reason for that, because that was the essence of the lease, as Judge O'Grady found, below. Now, they're saying, though, that you withheld your signature on certain paperwork that was against the project. Did the discovery in the case or any other aspect of the proceedings reveal exactly what paperwork they were referring to, and could you respond to what you did with regard to that? I can certainly address that, Your Honor, although I am not positive that that ever actually made it into the record before this court. But to address the question— Well, they're making their estoppel argument based on that. They're saying you wouldn't let them complete it. What the issue was is that they didn't have enough funds to be able to build the Darbin Mare. So what they wanted to do was take out a loan to be able to fund their construction. The only way the bank would do that is if they could put a lien on the property. RoostMD Foundation said they would not allow them to lien the property. They had no obligation to do so. The lease certainly didn't require it. And in fact, the one thing that does address that issue in general that was before the court in the record is the response email that Dr. Jahanian sent to the May 15, I believe it was, email after the memorandum of understanding. When ZCDMW sent over that their next step is they need to get plans done and that told us that we already have the accounting that Dr. Jahanian challenged. That was back in 2010, right? That was in 2011. And Dr. Jahanian warned them then, the worst thing that you could do is start construction without sufficient funds and get stopped in the middle. Because the RoostMD Foundation purchased this property in 1991 in the hopes that it could help foster the religion by having this Darbin Mare, this religious center here to serve the Zoroastrian community in the Washington D.C. area. And if a bank were to repossess that asset, seven acres, approximately $2 million worth of asset, because ZCDMW's eyes were bigger than its stomach and it bid off too much by trying to build this huge facility that it could not raise the money to pay for, the only person that would lose out of that is RoostMD Foundation. Because they're the ones who were going to have to sign a lien if they were going to finance this property rather than raising the funds as they had indicated was their intent all along. That is really a red herring on an estoppel argument because there was no obligation. More importantly, there is no evidence in the record that ZCDMW ever detrimentally changed its position and reliance upon an expectation that they would sign. But there was never at any point in time an amendment of the lease documents was there to alter construction deadlines or to change the fundamental understanding that construction of the religious center was the obligation of the lessee. Well, the lease says it and then the lease amendment that was signed in 2009 both sets that out. There was nothing after January of 2009 that changed that obligation. And the deadline set in that lease was in March 2013? There were actually three deadlines set in there. The first deadline was that they must start substantial construction not later than November 2009. As the court found below, that was never complied with. The second deadline was that they had to complete construction by March 15, 2011. The court below found that that was not complied with. There was a third deadline that was possible in the lease amendment, which was by written agreement, it could be extended to no later than March 15, 2013. The court found, and they admitted in discovery, that there was never a written amendment to the lease that would have extended that deadline. And so in April of 2013, Rustam Geeve Foundation formally notified them of the termination of the lease. Let's get to the issue of attorney's fees because it seems to me that that's something that might be a problem for you. In terms of your failure to segregate and prove how much of your attorney's fees were attributable to your successful claims versus your non-successful claims, what in the record supports your position regarding a segregation of claims so we know how much of it, for example, was attributable to the slander title claim on which you weren't successful? Don't we? I mean, under Virginia law, we have to discount that. Your Honor, first of all, I think the court did look at all of that. I mean, if you look at the, we submitted a request for $170,000. What shows that in the record? Tell us what in the record proves that you excessed the slander of title fees. We submitted, Your Honor, all of our detailed time records to the court, which went through and analyzed those. I can't point to a specific point that says that we broke out and said expressly as a request, this amount we're requesting for task X, other than to say we submitted the time records, which the court addressed that it went through and took a look at. And I think that the overall analysis shows that. Well, under the Virginia rule, isn't that your burden? Well, Your Honor, first of all, the Virginia case law really says that you don't parse it out that way. That the prevailing party in a contractual analysis of this is the party in whose favor judgment was entered. But there's also a case law saying that you don't get credit. I mean, you cannot recover for attorney's fees for claims that you unsuccessfully prosecuted. Isn't that true? Yes, Your Honor. That is true. Okay. So how does this record show on its face that your unsuccessful claims were not part of the basket of attorney's fees that you requested? Your Honor, I would have to point just directly to the time records as being the best indication of what we requested that the court consider. And that the court went through the Grissom analysis and applied the case law. And it cut approximately 40 plus percent of the request out of it. I think the court did adequately look at that and evaluated. What was your request? May I answer? Just tell me the amount. I believe we requested $170,000 roughly and the court awarded $99,000. So it cut it up not quite in half. Yes, Your Honor. But there's nothing in the record you can point to that says we have now excised or the court has excised any fees that were attributable to the slander of title claim. I cannot point to that specific issue, Your Honor. All right. Subject to any questions. Thank you. Thank you. Mr. Bowen, you have some rebuttal time. ZCDMW and RGF's view of what the record discloses are not surprising but dramatically different. And two points that were just raised by Mr. Ruling that I feel compelled to comment on. First, he made reference to a request for admission in which he suggested that RGF had asked and ZCDMW had admitted that we had not started construction. That's not true. And refer to Mr. Jahanian's... Well, certainly whether you started or not, you hadn't completed it by any of the deadlines. Isn't that correct? No, ma'am. That's not true either. In fact, as I... What did you complete? The renovation of the small structure, but you never built the center. Well, let's go back to one of the points... Are you saying that you built the big center that you agreed to build? No, ma'am. And that's not a requirement. If we go to the document that RGF is relying upon, which is on page 55 of the amendment, the document that they have echoed over and over again, specifically page 3, it says, lessee shall promptly begin preparation for construction of a Darby Marr Religious Center for worship and practice of Zoroastrian religion, et cetera, et cetera. There is nothing in there that I would refer to generically as architectural guidelines. It suggests what it has to look like, how it has to be, what it may have to be. So you're saying it could be a one-room hut? Absolutely. If they wanted, they prepared... Is that the intent of the parties, though, when you fairly read the documents, that you were going to build a one-room hut? The party's intent is expressed only by what the lease amendment says. The lease amendment was prepared by RGF itself. And that was part of the controversy in the court below, as I recited to RGF. Specifically, Dr. Jahanian made a lot of headway or tried to make a lot of headway about the fact that it was our clients who prepared and suggested the lease amendment. So you were trying to get a lien on the property in order to build a one-room hut? No, and that's not true either. It just seems to me that there's an absurd feature to that argument. But that's not the evidence, nor is that true. You have to come back to the fact that your rent is, what, $1 a year under the lease? Yes, sir. That is not a phenomenal amount of rent. Now, again, just trying to ascertain the intent of the parties. Your view is that they were willing to give you a $1 a year deal on a piece of land that is this large and located in Fairfax County, which is real estate, is of prime value, and that they expected nothing more in return than a few renovations and a one-room hut? I mean, why are you getting this $1 a year deal year after year after year after year so that you would do something? And the something has got to be the construction of a place of worship. That was their whole reason for giving you the deal. I first take issue with the court's point of view that there's something in the record that shows what the value of this property is. There is no evidence that shows what the value of it is. And quite frankly, it is mostly a flood. They could have found a tenant. They could have had all sorts of uses for it, in which it would have brought in a return of greater than $1 a year. It's been on the market for the last 18 months and hadn't been sold. So I suppose that's the best evidence of what it's worth. And I know that's not in the record, but we're talking about basically floodplain that has little or no other usage. Well, let me ask you directly about what's in the record. As I understood opposing counsel's argument, I thought he said that the representation that you've made, that your client fulfilled the construction requirement under the lease by virtue of remodeling whatever existing structure was there. Did you make that argument in the district court?  And where will we find that in the record? Well, that's a fair question. And as I stand here with a minute to go, I can't tell you specifically. What I can tell you is that in our papers, we made and doctor, excuse me, Mr. Shariari, the representative of DC, excuse me, ZCDMW testified that they had renovated this building on the facility. And there was no suggestion of what size it is. I've seen it. Again, it's not in the record. It doesn't fit the definition of a one-room hut, nor does the lease specify what it has to fit. But you can't cite to us a place in the record where you told the district court, we have fulfilled this lease condition by virtue of remodeling this structure. In our opposition to the motion for summary judgment, we certainly raised that issue. And that's where it first came before the court. And we had testimony by Mr. Shariari, who is the representative of the entity, ZCDMW, who specifically testified that his deposition was taken in January. And that as recently as the Sunday before, they were having religious services in the Darby Mar that they had in effect constructed on the facility by remodeling. And so you're telling us if we look at your opposition, pleading to the motion for summary judgment, that we're going to find the argument that says we have fulfilled this lease condition by virtue of remodeling the building. That is my recollection, your honor. All right, I see my time is over. All right, we thank you. And thank you to come down and greet the council and then take a brief recess.
judges: J. Harvie Wilkinson III, G. Steven Agee, Barbara Milano Keenan